Filed 6/23/26  D.S. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

D.S.,

    Petitioner,

v.

THE SUPERIOR COURT OF SAN MATEO COUNTY,

    Respondent,

SAN MATEO COUNTY HUMAN SERVICES AGENCY,

    Real Party in Interest.

</td><td>

A176054

(San Mateo County
Super. Ct. No. 25JD0065)

</td></tr>
</table>

D.S. (Father) has filed a petition for extraordinary relief from juvenile court orders terminating his reunification services with his child, L.S. (Minor), and setting a hearing under Welfare and Institutions Code[1] section 366.26.  Father asserts substantial evidence supports findings that he made progress and that there is a substantial probability of return of his child within six months.  He also argues he did not receive reasonable reunification services.  We deny Father's petition.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

## FACTS AND PROCEDURAL BACKGROUND

*February 2025 – Protective Custody, Petition, and Detention*

Minor was born in January 2025. When she was two weeks old, she was taken into protective custody due to concerns of general neglect by Father and Minor's mother (Mother).[2] Minor had lost 10 percent of her body weight since birth, placing her at risk of brain damage or death if further weight loss continued. Minor's doctor reported that the parents said they could not care for the baby and that they would argue and blame each other. There was no medical diagnosis to explain Minor's weight loss.

In February 2025, the San Mateo County Human Services Agency (Agency) filed a dependency petition on behalf of Minor under section 300, subdivision (b)(1), alleging "willful or negligent failure . . . to provide the child with adequate food . . . ." It was alleged that, despite the parents' claim that they were feeding her properly, Minor lost weight in four follow-up medical appointments and was hospitalized due to her weight loss.

On February 11, 2025, the juvenile court ordered Minor detained.

*March 2025 – Jurisdiction / Disposition Report and Jurisdiction*

In the jurisdiction/disposition report filed on March 26, 2025, the Agency recommended Minor be declared a dependent of the court and recommended family reunification services for Father and Mother. Father reported past alcohol abuse and methamphetamine, crack, cocaine, and marijuana use (although he reported he had been in recovery for seven years), and he was referred for alcohol and drug assessment and random drug testing. At a meeting with an Agency social worker on February 26, 2025, Father "spoke rapidly, did not always make eye contact, and would

_____

[2] Mother reported that she and Father are not married and were not living together when Minor was conceived but she was (as of February 2025) living with Father and coparenting Minor. Mother is not part of this petition.

ramble off-topic." On March 5, Father texted the social worker asking when he would get his daughter back and, "what else do we need to do I need my daughter back I'm not waiting forever." On March 6, he texted, "I'm already doing great . . . ." and, "[I] did the drug test and have assessment next week even though I've have [*sic*] all these times in recovery and everyone knows I'm a great father . . . ." The next day, he texted that he was "a great parent and safe parent."

On April 3, 2025, Father and Mother submitted on jurisdiction, and the juvenile court sustained the petition. A hearing on disposition was scheduled for May 13.

*May 2025 – Addendum Report and Disposition*

In an addendum report on disposition filed on May 8, 2025, it was reported that Father told the social worker he wanted Minor returned to him within one to two months. On April 17, Father texted the social worker that he wanted to know that day about the class he had to take, he was "not happy with anything that going on," and the Agency "keep[s] making things harder on me." On April 22, Father told the social worker he was ready to have Minor returned to his care.

The Agency social worker met with Father and his "Bridges to Wellness case manager."[3] The case manager reported that she had worked with Father for three years. The case manager said Father "had not parented before, and he struggled with insight," and she "reported that the father currently did not have income, and the father believed that the County would

---

[3] The Agency described Father as "receiving comprehensive case management services from Bridge to Wellness that assists him with day-to-day living." The case manager said she helps Father "coordinate, collaborate, link to community resources and . . . financial support" and "provides coaching, managing emotions, and depression . . . ."

provide everything." Father was currently "living in a mental health unit, where he did not have to pay rent [and] . . . he entered this unit from being unhoused and with no income." The case manager "wanted the father to understand that [Minor] was not a toy and that she would be around him for a very long time." She described Father as " 'short fused' and that he had a 'short temper.' " She said he "was not good at problem solving, but he was not violent," and she believed Father "could be a wonderful father but needed to learn more skills." Father participated in random drug testing, and his results were all negative.

Father was offered supervised visits three days a week, and he attended all his scheduled visits. At one visit, he "talked to [Minor] in a soft tone" and she smiled. In another, he prepared a bottle for Minor and changed her diaper. In another, he read a book to Minor. At another visit, Father commented that the room felt hot; he began to sweat, and his eyes darted around the room. He denied feeling ill, but while holding Minor, he went to a trash bin and vomited. He appeared flushed and sweaty. Father "stated that he might be stressed and had come to the realization that he may have to do this alone." (Mother had mental health issues and had told the social worker that she was not able to take care of Minor and would rather Minor was with the foster parents.) In May, a family care worker who supervised Father's visits reported that Father had been cautioned "more than several times" to support Minor's head and neck, but he was often observed holding her by her torso without supporting her neck and head with his hand. Father was also cautioned that putting the bottle in Minor's mouth while she was crying could cause her to choke, but he continued to try to feed Minor when she was crying. And it was reported that Father "continue[d] to need ongoing

intervention and support from visitation staff on keeping up with [Minor]'s cues."

The social worker believed Father may have "some type of delay or issue with cognition, which impair[ed] his ability to safely care for [Minor] on his own, at this time," but she hoped with parenting and dyadic sessions, Father would be ready to step down to monitored visitation soon.

At the disposition hearing on May 13, 2025, the juvenile court ordered family reunification services for Father and Mother. Father's case plan included individual therapy, a psychological evaluation including the requirement to engage in the recommendations made by the provider, dyadic therapy with the child, Safe Care parent education, and a co-parent counseling program, plus visitation. Under the psychological evaluation component of the case plan, Father was to "[e]ngage in services provided by The Arc and similar agencies that provide support to adults with disabilities." His service objectives included, "Express anger appropriately and do not act negatively on your impulses" and "Meet your child[]'s physical, emotional, medical, and education needs."

*August 2025 – Interim Report and Hearing*

In an interim review report filed August 11, 2025, the Agency reported the following. On June 11, Father met with a new Agency social worker and demanded that Minor be returned to him at the next hearing. On June 16, Father said a psychological evaluation was not needed. He did attend an evaluation, however, and the evaluating psychologist diagnosed Father with unspecified bipolar disorder, unspecified anxiety disorder, and borderline intellectual functioning. The psychologist "explained that the father presents with severe irritability, mood swings, emotional dysregulation, anger, grandiose ideation, and hypomanic/manic features." She wrote that Father

5

showed "eagerness and a high level of commitment," but "he may need more time to demonstrate that he can independently parent the child."

On June 24, Father texted the social worker that he was not going to attend his scheduled visit because " 'I have to move on it been [*sic*] ruff day.' " He continued, " 'Plan is I want her back on Aug 12 like I said.' "

At a supervised visit on July 1, 2025, Father threatened to choke the social worker to death at the upcoming hearing if Minor was not returned to his care at the interim hearing. Father said that "if the child is not returned to his care, he won't have anything to live for and that the mother 'better prepare to take full custody of the child' because he is going to 'end up in jail.' " "He further stated, 'if I don't get her back on August 12th, whoever is next to me is gonna get it. I don't care who it is. I have nothing to lose.' " Father said he would get everyone fired and said to Minor, " 'you won't have a dad anymore,' and then said he would no longer be attending visits." Based on Father's threats, the Agency determined it was unsafe to continue with the standard supervised visits. The social worker texted Father that she needed to discuss his behavior and threats. Father then sent many messages demanding that Minor be returned to his care. He "stated that he refused to speak any more about the case and refused to speak to the [social worker]." Father denied that he made threats and asked for proof. The social worker texted that visits were being paused until the threats could be discussed. On July 9, the social worker sent an email to Father and his attorney explaining that the Agency needed to coordinate secure visits.

On July 16, 2025, the social worker texted that visits would resume on July 18 at the visitation room in the courthouse with law enforcement present. Father sent the social worker many text messages expressing his frustration and demanding the hours of visits he believed he was owed.

Father continued to text the social worker, although he requested that she stop texting him. Father left a message with the program manager saying he could not work with either the social worker or her supervisor, "the visiting hours aren't going to work, and he'd 'rather wait for a Hearing.'" The case was transferred to another social worker.

Father then "profusely bombarded" the social worker (whom Father had threatened to choke), the social worker supervisor, and the program manager with lengthy text messages. He left a message with the program manager that "Everyone is lying to him" and "Nobody is doing their job."

Father engaged in individual therapy, but when the therapist asked if he could attend one of Father's visits with Minor, Father became upset and said he did not want to participate in therapy any longer. Father had been referred to a psychiatrist and prescribed medication in January 2025, but he failed to show up to appointments and services were terminated.

The Agency was concerned about Father's "volatile and angry outbursts," which "made it extremely difficult" for the social worker to work with Father. The Agency concluded, "The father's demonstrated inability to calm down and inability to apply healthy coping mechanisms when in distress or upset when things don't go his way make[] it very concerning as to how he will care for a young child." (At that time, Minor was less than seven months old.)

At the interim hearing on August 12, 2025, the juvenile court ordered continued services for Father and Mother.

*November 2025 – Status Report and Recommendation to Terminate Services*

In a six-month status report filed on November 5, 2025, the Agency recommended termination of reunification services for Father and Mother. Father was engaging in individual therapy, but he consistently declined to

7

participate in a psychological medical evaluation or participate in anger management courses. Father became "enraged" when the social worker explained the recommendations and said he did not need anger management, and it was his right to decline psychotropic medication. On another occasion, he yelled at the social worker over the phone such that she "could not get a word in." Father insisted that he was calm and said he was recording the conversation. The social worker submitted referrals for anger management class in September and October. On October 27, Father reported that he would begin anger management classes on October 30.

Father completed his Safe Care parenting classes. At an in-person case plan meeting, Father said he wanted his daughter back for the holidays and then he was leaving San Mateo County. At the end of the meeting, Father said he no longer wanted to attend visits because he felt depressed. At a visit on September 2, 2025, Father changed Minor's diapers while a psychiatric services worker "assisted and provided tips." She reminded Father to wipe thoroughly and suggested ways of putting Minor's pants back on as Father was having difficulty with this task. At a September 24 visit, Father said he would not accept feeding advice from the family care worker and would only listen to a doctor. Father did not feed Minor or change her diaper during the entire visit.

The Agency concluded: "Prognosis for the child returning to her parents' care at this upcoming hearing is poor. The father has been consistent with most of his case plan services and visits; however, due to the severity of the allegations of general neglect between the parents and child leading to her removal, the father has not shown insight regarding [how] his behaviors can affect the child's physical, emotional and overall well-being. The Agency has worries that the father has not shown any behavioral

changes that he can put the child's needs first, regulate his emotions and behavioral outbursts.  Whenever a situation emotionally triggers the father, he has displayed severe emotional tantrums/rage, walked out during visits with his daughter, or follow instructions [*sic*] from Family Care workers informing them that he will not take any orders from them unless they come from a judge or doctor.  Furthermore, it should be noted that the father is often verbally and emotionally abusive towards the mother, threatening her that once their child goes back to his care, he will have full custody, and she will have no access to their child.  The father has not taken any accountability for his own actions on why his daughter was removed from his care; and has challenges with being receptive to constructive feedback even when it benefits him."[4]

Father objected to the Agency's recommendation to terminate reunification services, and a contested hearing was set in March 2026.

*March 2026 – Additional Reports*

In an addendum report to the six-month status report, which was filed March 17, 2026, the Agency continued to have "ongoing concerns due to the parents' emotional instability [and] their inability to take accountability for their own actions that led to their daughter's removal as they often blame each other."

The report documented incidents "demonstrating [Father's] emotional dysregulation and unaddressed mental health posing safety risks to the child's physical and socio-emotional well being."  In August 2025, a visit was

---

[4] As for Mother, the Agency wrote that she "made it clear to the Agency that she would prefer their child to be adopted by foster parents, as she understands that she cannot provide emotional, mental and financial support to their daughter.  [Mother] has also shared her concern about how she believes she and the father cannot provide adequate care for their daughter despite the love they have for her."

cancelled due to Minor's potential exposure to Covid, and Father "became enraged and demanded that his daughter be removed from the caregivers" and yelled at the social worker. The social worker told Father she would talk to him later after he calmed down, and he then called 12 times, emailed her three times, and sent her 42 text messages. On two consecutive days in September, Father left 18 messages for the program manager stating he was owed visits, he was being profiled and mistreated, and he refused to speak with the social worker (a new social worker after the one he threatened to choke to death was removed from the case). Later in September, Father again "became enraged" when he was told of a medical appointment for Minor and accused the social worker of giving him the wrong address. The Agency was concerned that this incident showed Father "became fixated" on the idea that the "Agency [was] 'failing him' [such] that he did not pay attention to details [of] . . . his daughter's medical appointment." (The social worker and another provider had given him the correct address.) In a four-day period in early October, Father sent the social worker 13 texts and two emails and called her five times to tell her to stop contacting him because he felt "profiled" and he did not think the Agency was helping him. During a week in mid-October, Father texted the social worker 70 times and called 34 times, saying, among other things, "that he does not need help from the Agency or his counsel because he will represent himself." On December 31, the social worker called Father about the foster parent's concern that Minor's diaper was not changed during a visit and that she vomited from being overfed. Father "became progressively angrier during the phone call" and the social worker said they would talk after he cooled down. The Agency was "concerned that the father becomes easily emotionally dysregulated when provided feedback on care for his child." On February 12, 2026, Father

"became irate" when the social worker reminded him to document foods Minor eats and when he changes her diaper during visits.[5] He sent the social worker 33 texts and called her 10 times.

In December 2025, Father progressed from secure supervised visits at the courthouse to supervised visits at the library. A serious incident occurred at a visit at the library on March 12, 2026 (five days before the addendum report was filed). A librarian asked Father to lower his voice, and Father said he wasn't being loud and said "in a combative tone to the librarian" that he was being profiled and targeted. Two other librarians came to assist the first librarian. Father "told the librarian that he needed to talk to the top person to make a complaint because it's not okay for them to profile him and his daughter." Holding Minor, Father "continued to mumble and rant" about being profiled, and the family care worker encouraged Father to make his complaint *after* the visit and to spend the remaining time focused on Minor. Father took an elevator to the third floor and "asked to talk to the biggest boss" to make a complaint. Father said he would file a lawsuit and " 'I know everyone from the city council' " and the librarian " 'will be replaced.' " He said he would " 'make sure' " " 'that lady gets fired.' " Carrying Minor, Father said to her, " 'sorry baby, the library should be safe for us but it's not, it breaks my heart. It makes me want to cry and I'm getting emotional because this always happens when I come here and it's not okay, I'm tired of getting profiled. But you['re] not coming back here, not with your mom, not with anyone.' " He put the Minor down and told her it made him sick to be in the

---

[5] This appears to relate to the foster parents' report that Minor had been sick around her birthday and was put on a BRAT diet, which Father was told about. The foster parents were concerned because Father said he gave Minor a cupcake during their visit, but he did not list the cupcake on the log (he logged only that he gave her a 3 oz. pouch of banana almond butter). Minor vomited after the visit.

library now.  The family care worker asked if Father would like to step outside.  Father took Minor outside and began to cry.  The family care worker encouraged Father to take deep breaths.  Father held and hugged Minor as he cried and said he was tired of getting profiled.  He said to Minor, " 'This is the last time you'll see this library until I see changes.  It's not fair.  Daddy was happy and now they ruined my whole day.' "  A library staff member came out to talk with Father, and he repeated that he wanted "that lady fired" and said, " 'I know people who give this library money.  The people I know fund this library and they are going to talk to this big bosses [*sic*] and this library won't be here anymore, it will be gone.' "  Father continued complaining to staff and talking about getting the librarian fired for the rest of the visit.

The Agency continued to recommend terminating reunification services for Father (and Mother).  The Agency explained it "remain[ed] concerned about father's lack of behavioral change, emotional dysregulations and lack of insight of how his actions have impacted his child.  Additionally, the father demonstrated that he cannot put his child's needs first because when emotionally triggered, he has walked away from visits, meetings, refused to feed his daughter or change her diapers, despite being instructed by the Agency.  The Agency . . . had multiple meetings with Central support staff, providers and a Child and Family Team Meeting to help support the parents in their reunification services.  The Agency and providers share[d] the same concerns about the parents' mental health, and the father's emotional dysregulations and inability to be receptive to other perspectives.  Furthermore, the father's verbal and emotional abuse towards the mother and threats to alienate the mother from their child, is a concern for the child's emotional well-being, stability and safety."  The Agency recognized that both

parents "truly love their daughter" but concluded, "love for a child or checking boxes to fulfill services is not enough"; Minor deserved "caregivers [who] have the ability to put their child's needs first."

A second addendum report was filed on March 23, 2026. The Agency reported that, following the March 12 library incident, it was decided that Father's visits would be moved back to the courthouse starting March 18. The Agency was concerned that Father was "having challenges following the rules of public areas . . . and will become so dysregulated whenever a boundary is set," and his difficulty "regulating his emotions . . . prevents him from putting his child's needs first." During a visit on March 17 (before the transition to the courthouse), Father texted the social worker that there was no way for him to get to the courthouse for visits and that the social worker was "messing with his mental health." That day, Father left repeated messages for the program manager stating in a "raised" voice that he did not want the social worker calling or texting him and he would "continue calling every single day and will report everything to the police." He said if the social worker was not removed from the case, "he's going to call the license board." He stated the social worker was "triggering him" and he could "take [her] license away for her lying" and "he will continue calling day in and day out until this is resolved" and the social worker is "gone." The next couple of days, Father called and texted the social worker and program manager in a similar manner and accused everyone of lying. He identified two other Agency employees who "need[e]d to be removed" in addition to the social worker.

The social worker spoke with Father's therapist who had been working with Father for four years. The therapist said Father had "made some progress with his goals," but it was important for Father to develop skills in

13

emotional regulation. The therapist reported that Father's "mental health team encouraged him to get a psychiatrist to get medication to address his anxiety, depression, and history of suicidality," but Father has always declined to do so.

*Contested Hearing*

At the contested hearing on March 26, 2026,[6] the current social worker and Father testified.

The social worker testified that she had spoken with Father's other service providers (that is, service providers Father worked with before the dependency case) about "his overreaction to things" and those providers reported they "have worked with him on processing, understanding, being reflective of his action and what he can do differently" and they "have worked with him for many years on that." Agency staff also talked with Father about his overreactions and "emotional dysregulation," but the social worker had not observed any change in Father's behavior in this regard over the course of the dependency.

Father testified his therapist "hasn't seen the need for [him] to be on medication." He denied that he threatened the previous social worker in July 2025. Regarding the recent March 12 library incident, Father testified he "stayed calm in the situation," and he used "all of [his] coping skills" that he learned in the programs he had completed. As to whether he would be able to take care of Minor if she was returned to his care, Father first said that his caseworker could help him out and then said he had "a lot of support." He testified, "You know, my mom raised seven kids. I can do it. I got a lot of

---

[6] Father acknowledges that, although this was a contest of the six-month review hearing, the 12-month review was to be held only eight days later. Father asserts "a substantial probability of return exists by the 18-month date."

resources and I'm a great father and I can make it happen." Father testified he would accept guidance from the Agency on how to care for Minor if she was returned to his care.

In closing argument, the Agency's attorney pointed out Minor "was removed from the parents' care because the parents were unable to read the cues as to when she needed food," and argued Father's testimony demonstrated there was "a real problem here with the father knowing when to refocus his attention back on his daughter [(who was then 14 months old)] and focus on the cues." The Agency attorney "commend[ed] the father for participating in the case plan, completing anger management, undergoing drug treatment when he has been sober for a number of years, consistently engaging in therapy," but she argued, "even with all of the skills he has learned, there is still not a change in this behavior and how he cares for [Minor]" and he has been "unwilling to take any medication to try to control those behaviors."

The Agency attorney concluded, "[A]t this point [Father] has received almost a year worth of service. [Minor] is still in secure visits . . . and the father has not shown that he is able to adequately care for her to the point where [Minor] could ever possibly return to his care."

Father's attorney argued, "he has done every single service that he has been asked to do," "all of his providers almost without exception, talk about how he has improved," and he "is modulating his emotions better." He acknowledged that the Agency had not provided visits longer than two hours, so the court could not know how Father would handle being with Minor for longer periods. His attorney asked, "Would he continue to feed . . . appropriately from his bag with his cut up fruit that he does every single day and change diapers? Could he do that for three hours or four hours or six

15

hours? We don't know and the Court is entitled to know that." Father's attorney asked the court to extend Father's services for another six months and to increase the length of his visits.

Father's attorney also suggested the services were inadequate because the Agency did not provide him a "parent partner." He argued, "[T]here has been some lack of trust between [Father] and the Agency," but "if he had somebody that could have assisted to develop a little more trust and interface with the [Agency], I think that would have put us on a better path." He said, "[T]his is not a normal client. Look at the psychological evaluation. The services called for more than what were offered here. I think the services were insufficient."

Minor's attorney argued that the social worker and Father himself demonstrated "that he has received tons of services. This is not a case where he has not been provided significant services."[7] She cited "18 incidents of the father becoming so dysregulated that he cannot focus on the child and instead he focuses on whatever it is that has bothered him." She argued the evidence showed Father's "behavior becomes out of control and escalates and escalates and escalates and that he is unable to deescalate. And despite many years of weekly counseling with the therapist that he has a good relationship with, he has not been able to find a way to keep that from happening." The attorney concluded, "[Minor] is only 14 months now. She's going to change throughout her life. The problems are going to change regularly as she grows, and I'm just concerned that his inability to control

---

[7] Minor's attorney did not think a "parent partner," with no "training in social work or psychology or child development" "would be an appropriate person to put in the middle of this case." She noted that the Agency provided family care workers who "do have training and do this for a job" and were with Father and Minor for every single visit.

his—whether it's anger or anxiety or a feeling that he is being targeted and treated differently that that behavior is going to have an impact on her, a very detrimental impact on her."

*Juvenile Court Decision*

The juvenile court adopted the Agency's recommended findings and orders, terminated family reunification services for Father and Mother, and set a section 366.26 hearing for July 6, 2026.

The court explained: "This is a hard case because [Father] has done so much in terms of classes and working on his sobriety and engaging with members of the community and meeting with his therapist and taking parenting classes. And I think that he has, for the most part, wholeheartedly participated in the services that were provided to him.

"I think overall he has done a very good job attending the classes, learning from those classes, having a good recall of the material from those classes.

"I think where—and I have to look at when we talk about whether they have made substantive progress, it is not just completing services. It is have they made progress in a substantial nature such that the Court can feel comfortable returning the child to them and to the fact that they have addressed the issues that brought them before the Court and brought the child before the Court."

Addressing Father, the court stated: "The inability to regulate your reactions and your emotions—and I have no problem with the fact that you are an emotional person and that you are effusive and that you are kind of there [*sic*] and sometimes you are a little loud. I understand you get excited with your daughter and, you know, you are having a good time in the library, who hasn't been shushed in the library. We all have. Myself probably

17

multiple times.  [¶] But it's how you handle that and what your focus is, and I think that is what still has not been addressed and is the problem in this case.

"I think it is what leads me to conclude that you have failed to make substantive progress to address the issues that brought you and brought [Minor] before the Court.  You continue to become dysregulated and you forget about [Minor].  You forget or your focus is so much so that you don't feed her.  You don't change her diapers.  Many times you do.  But if something traps your attention, she is not the priority anymore."

The court found by a preponderance of the evidence that return of Minor would create substantial risk of detriment, it found by clear and convincing evidence that the Agency provided reasonable services, and it found that return was unlikely to occur with another six months of reunification services.

## DISCUSSION

"We review an order terminating reunification services to determine if it is supported by substantial evidence.  [Citation.]  In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.  [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

In this petition, Father does not challenge the juvenile court's finding that the return of Minor would create a substantial risk of detriment to

18

Minor.[8]  Instead, Father contends: (1) he "made progress, and a substantial probability of return exists in the next six months" and (2) the reunification services were not reasonable.  (Bolding and capitalization omitted.)

A.      *Substantial Progress and Probability of Return in Six Months*

Father argues, "Substantial evidence supports that [he] wholeheartedly participated in court-ordered services, made progress, and a substantial probability of return exists in the next six months."  (Bolding and capitalization omitted.)  He summarizes the classes he took on anger management and parenting and highlights his consistent visits with Minor and his participation in therapy.  He minimizes the abundant evidence of his difficulties regulating his emotions and ignores altogether the concerns about his inability to respond to Minor's cues.

Thus, Father reargues the position he took at the contested hearing, but he fails to show the juvenile court erred in making different findings.  "The Court of Appeal is not a second trier of fact and a writ petition is not a trial brief.  We are bound to uphold the challenged order, particularly if supported by findings of fact, if it is supported by substantial evidence.  Evidence not favorable to the petitioner cannot be simply ignored as if it does not exist."  (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.)  " '[O]ur power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the

---

[8] Section 366.21, subdivision (e)(1), provides that at the six-month review hearing, but no later than 12 months after the child entered foster care, the juvenile court "shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

19

credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Ibid.*)

Here, substantial evidence supports the juvenile court's finding that Father "continue[d] to become dysregulated" and would "forget about [Minor]." Father claims it is "noteworthy that, despite hearing negative testimony and detractors from his abilities and the work he completed, he did not escalate" during his testimony at the contested hearing. We cannot say it is clear that Father remained calm at the hearing; the reporter's transcript does not show whether he raised his voice or spoke angrily or rapidly. But even if Father was able to remain calm at the hearing, this fact alone does not address the many, many concerning incidents described by the Agency and his overall lack of progress as to the case plan goal of "regulation and increase[d] . . . capacity for frustration tolerance."

The juvenile court found that Father "wholeheartedly participated" in many of the services provided to him. But, the court explained, "it is not just completing services"; the issue was whether Father "made progress in a substantial nature" that "addressed the issues that brought [the family] before the [c]ourt." Substantial evidence supports the juvenile court's findings that Father did not make "substantive progress to address the issues that brought [him] . . . before the [c]ourt" and—given Father's inability to change his behavior over many months and years despite the efforts of many service providers—return of the Minor to the home was not likely in the next six months.

"Because the juvenile court's findings are adequately supported by the record, we have no power to disturb them." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1167.)

20

B.     *Reasonableness of Services*

The juvenile court found by clear and convincing evidence that the Agency provided reasonable services, explaining that "the services that were provided were significant" and "addressed all of the right areas."

" 'Reunification services must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." ' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] . . . [W]hile 'services need not be perfect,' they 'should be tailored to the specific needs of the particular family.' [Citation.] In this regard, ' "[t]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." ' " (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1151.)

Father argues insufficient evidence supports the court's finding of reasonable services "because the Agency did not reach out to any other providers, despite knowing about Father's mental limitations." (Bolding and capitalization omitted.) He faults the Agency social workers because they "did not seek guidance with anyone outside the office with specific expertise to assist Father," he was not provided a "parent partner" and he suggests "continued behavioral modification therapy or an additional emotional regulation therapy or a group therapy with those of a similar intellectual ability, with a certified therapist" might have been helpful. He further

21

suggests a referral to neuropsychologist "to help mitigate sensory issues, or possibly . . . a nutritionist to advise on food dyes and additives that may be overstimulating" would have been reasonable.

Father's arguments are not persuasive. He was referred to "agencies that provide support to adults with disabilities."[9] At the contested hearing, the social worker explained that the Parent Partner Program was a new program with Behavioral Health and Recovery Services (BHRS) that did not exist when Father's case plan was created and, further, Father was not currently eligible for the program because his mental health clinician was not from BHRS. And, we must keep in mind that "in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

The record in this case shows the Agency " ' "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult." ' " (*B.D. v. Superior Court*, *supra*, 110 Cal.App.5th at p. 1151.) We agree with Minor's attorney that Father "has received tons of services. This is not a case where he has not been provided significant services."

---

[9] And, in any event, the juvenile court found Father did "a very good job attending the classes, learning from those classes, having a good recall of the material from those classes." Father's difficulties in making substantive progress appear to stem from behavioral issues, not intellectual deficits.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P. J.

_____

Desautels, J.

A176054, *D.S. v. Superior Court*